**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal No. 11-81 |
| | ) | Civ. A. No. 14-938 |
| | ) | Judge Nora Barry Fischer |
| CATHERINE SLANE, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

I.    INTRODUCTION

Presently before the Court is a motion to vacate, set aside or correct sentence filed by Defendant Catherine Slane ("Defendant"), through her pro bono counsel,[1] relying upon *Missouri v. Frye*, 132 S. Ct. 1399, 1408 (2012), and *Lafler v. Cooper*, 132 S. Ct. 1376 (2012), and arguing that she was provided ineffective assistance of counsel concerning a plea offer purportedly extended by the Government during pretrial proceedings in this case. (Docket No. 239; 244). Specifically, Defendant argues that the Court should vacate her sentence of sixty months' imprisonment and resentence her based upon the alleged plea offer set forth in an email by Government counsel which she claims was not sufficiently explained to her by her trial counsel.[2] (*Id.*). She contends that she was prejudiced by such deficient representation in that she went to trial, was convicted and was sentenced to a higher period of incarceration than she would have been subject to had she pled guilty under the terms of the purported plea agreement offer. (*Id.*). Critically, she makes no claims directly challenging trial counsel's performance at trial nor asserts that she is not guilty of the offenses of conviction but focuses on the asserted deficiencies

---

[1]    Defendant's pro bono counsel consists of James Kraus, Esquire, John Schwab, Esquire and Peter Wolff, Esquire of Pietragallo Gordon Bosick & Raspanti, LLP.

[2]    Defendant's trial counsel was Stephen Capone, Esquire.

in trial counsel's advice surrounding the plea discussions with the Government. (*Id.*). The Government opposes Defendant's Motion, advocating that the Court deny same without a hearing because she cannot establish that she was prejudiced by trial counsel's alleged poor advice. (Docket No. 241). Among other things, the Government cites Defendant's sworn statement at the pretrial conference that there were no plea agreement offers; her repeated assertions of innocence and denials of culpability throughout trial; and the Court's finding that she committed perjury at trial, testifying falsely about several material matters. (*Id.*).

For the following reasons, the Court agrees with the Government that the facts of record clearly demonstrate that, even if the Court assumes that the pretrial email from the Assistant United States Attorney to her trial counsel constituted a plea offer, which the Court expressly does not, Defendant cannot meet her burden to demonstrate that she would have accepted the plea offer, *see Lafler*, 132 S. Ct. at 1385, given her assertions of innocence to her trial counsel from the outset of this case, which she similarly made to her therapist throughout the same time period and which she took so far as to commit perjury during her trial. *See Quintana v. Chandler*, 2012 WL 3151260, at *1 (N.D. Ill. Aug. 2, 2012) ("[Defendant] told his lawyer that he committed no crime—going so far as committing perjury during the state trial in maintaining his innocence—and even sufficient advice would not have changed [Defendant]'s mind."). Accordingly, Defendant's § 2255 Motion to Vacate [239] is denied.

II.     BACKGROUND

The facts and circumstances of this case have been written by the Court extensively in prior decisions and were recounted on the record in detail during its Rule 29 oral ruling at the conclusion of trial and throughout the sentencing phase of the case, which consisted of several loss hearings and two separate sessions of the sentencing hearing. (Docket Nos. 209-12; 211;

225; 227; 230). Therefore, the Court focuses its recitation of the background on the facts necessary to resolve the pending Motion.

### A. Charges, Conviction and Sentencing

Defendant was among three individuals charged in a detailed, fourteen page indictment returned by a federal grand jury in this District charging her with one count of Wire Fraud Conspiracy in violation of 18 U.S.C. § 1349 and four counts of Wire Fraud in violation of 18 U.S.C. § 1343. (Docket No. 1). The charges arose from mortgage fraud activities in which she participated while she was working as title/closing agent at 1st Olympic Settlement in Pittsburgh. (*See generally*, Rule 29 Ruling, Docket No. 209-12). The other individuals charged in the Indictment, appraiser Sam Shaheen and mortgage broker Peter Kamaras, both later pled guilty pursuant to plea agreements with the Government. (*Id.*). Two other individuals, Russell Goggin, a real estate investor, and Mellissa McCauge, another former 1st Olympic Settlement employee, were purportedly involved in the fraud but were not charged as they were both deceased. (*Id.*). The Government's case against Defendant consisted of her allegedly closing and/or directing others at 1st Olympic to close twenty-six separate real fraudulent estate transactions involving $3,000,000.00 in loans and causing nearly $1,000,000.00 in losses to the victims of the mortgage fraud. (*Id.*).

Defendant's trial counsel was appointed to represent her under the Criminal Justice Act as of April 20, 2011. (Docket No. 11). With the assistance of her trial counsel, Defendant entered a not guilty plea at her arraignment. (Docket No. 19). Pretrial litigation was uneventful with the parties litigating a discovery dispute through which the defense sought identification of all of the transactions the Government intended to present at trial to prove its conspiracy case.[3]

---

[3] The Court also appointed an investigator to assist in preparing the defense to this case. (*See* Docket No. 190 at 66).

(Docket No. 37-41; 78; 103). The Court advised that it intended to order such production well in advance of trial and the Government acquiesced, producing its exhibits and a chart of the relevant transactions at least two months prior to the trial date. (Docket No. 239-2). As is more fully described below, the record is undisputed that no formal plea agreement offers were made to Defendant; plea negotiations consisted of a lone email from the Assistant United States Attorney to Defendant's trial counsel in July of 2012 and a very brief, off the record, exchange between counsel at the final pretrial conference on March 28, 2013. (*See* Docket Nos. 239-1; 238).

In any event, Defendant maintained her not guilty plea and proceeded to trial at which the Government presented overwhelming evidence of her guilt and she testified in her own defense. At the conclusion of trial on April 12, 2013, Defendant was found guilty of one count of Wire Fraud Conspiracy in violation of 18 U.S.C. § 1349 and three counts of Wire Fraud in violation of 18 U.S.C. § 1343, at Counts One, Two, Five, and Seven of the Indictment. (Docket No. 137). However, she was acquitted of one count of Wire Fraud, at Count Eight of the Indictment. (*Id.*).

The case then proceeded to litigation of numerous sentencing issues, which became more contentious after the entry of pro bono counsel and their desire to raise numerous additional objections to enhancements that were not initially lodged by Defendant's trial counsel. This posture triggered the Government's pursuit of additional enhancements based on the prosecutor's belief that Defendant had breached an agreement not to challenge the enhancements via the supplemental objections. To this end, the Presentence Investigation Report in Defendant's case initially calculated her advisory guidelines range as 87 to 108 months' imprisonment. (Docket No. 172). At that point, her trial counsel lodged a single objection to the Probation Office's calculation, arguing that the two-level enhancement for obstruction of justice under Guideline

4

3C1.1 based on her alleged commission of perjury at trial should not apply. (Docket Nos. 179; 185). (If successful, Defendant's advisory guidelines range would have been reduced to 70-87 months.). The Court ordered the transcripts of the proceedings and established a briefing schedule in order to resolve this dispute. (Docket No. 185). Pro bono counsel then joined Defendant's trial counsel to form a "sentencing team" of four lawyers providing her assistance at sentencing. (Docket Nos. 186; 187).

During this litigation, the Court made a series of rulings on the applicability of sentencing enhancements. Relevant here, the Court overruled Defendant's objection to the obstruction of justice enhancement and found that Defendant committed perjury during her trial testimony in several instances more fully described below. (Docket No. 211). The Court also overruled all of the supplemental objections that Defendant pursued through her sentencing team,[4] (*id*.), but agreed with the Government that several additional sentencing enhancements were applicable in her case.[5] (Docket Nos. 211; 230). Ultimately, the Court computed her advisory guidelines range as 151-188 months based on a total offense level of 34 and a criminal history category of I. (Docket No. 230). However, over strenuous objections by the Government, the Court granted a downward departure of seven levels under Guideline § 5H1.11, reducing the advisory guidelines range to 70-87 months and subsequently granted a variance after considering all of the § 3553(a) factors, resulting in the sentence of 60 months' incarceration, which Defendant is presently serving. (Docket No. 231). Neither party appealed the Court's sentence, making all of the Court's rulings, including that Defendant testified falsely as to numerous material matters at trial,

---

[4]     As noted in the Tentative Findings and Rulings, the Court overruled Defendant's Supplemental Objections to the application of the following enhancements: (1) ten or more victims under Guideline § 2B1.1(b)(2)(A); (2) vulnerable victims under Guideline § 3A1.1(b)(1); and, (3) abuse of position of trust or use of special skill under § 3B1.3. (Docket No. 211).
[5]     The Court denied the Government's pursuit of a loss amount in excess of $1,000,000; finding that the loss amount was between $400,000 and $1,000,000. (Docket No. 227). However, the Court applied the following enhancements: (1) two-level enhancement for use of sophisticated means under Guideline § 2B1.1(b)(10); and (2) a three-level enhancement for Defendant's leadership role under Guideline § 3B1.1(b). (Docket No. 230).

final.  *See Kapral v. United States*, 166 F.3d 565, 577 (3d Cir. 1999) ("If a defendant does not pursue a timely direct appeal to the court of appeals, his or her conviction and sentence become final […] on the date on which the time for filing such an appeal expired.").

### B.  *Defendant's Assertions of Innocence and Denials of Culpability*

The record is replete with references of Defendant's assertions of innocence, denials of culpability and refusals to accept responsibility for her conduct from the date of her Indictment through her trial.  (*See* Docket Nos. 190, 191, 211).  Only at the first session of the sentencing hearing in December 2013 did Defendant make any effort to accept responsibility for her actions, at which point she made a statement to the Court wherein she acknowledged that she accepted the jury's verdict and admitted that she submitted settlement statements to lenders that did not reflect the reality of the transactions; permitted down payments to be made after the closings; and did not follow the proper procedures to close the loans.  *See Sent. Trans. 12/4/13*.  Indeed, after the Government presented an overwhelming amount of evidence against Defendant at trial including 28 witnesses and hundreds of exhibits, she took the oath swearing to tell the truth during her testimony, but she repeatedly and falsely denied that she was aware of the fraud.  (*See* Docket No. 190 at 74 ("Q And basically your defense is that you didn't understand that this fraud was happening. Right? A I did not know anything about it.")).  Defendant explained to the jury that she had told her trial counsel that she was unaware of the fraud "the day I met him" i.e., when he was appointed to represent her in this case in April of 2011, continuing that her "story has not changed because it's the truth."  (Docket No. 190 at 73).  Trial counsel carried forward Defendant's proclaimed innocence at her trial nearly two years later, arguing in his opening statement that the evidence would show that she was "duped" by the real "fraudsters" like Goggin, Kamaras and Shaheen to unwittingly participate in the scheme.  *See Trial Trans. 4/2/13*

("Don't allow an innocent person to be convicted just because someone says she's guilty or the documents point to that. Follow the money.").

Defendant's denials of culpability were extensive and not credible, as the Court recounted in its Tentative Findings:

1. **Findings of Fact as to Trial Testimony Regarding Knowledge of Coconspirators**

   a. When asked at trial: "Did you know that [Mr. Goggin] was involved in fraud," Defendant testified: "No, I did not." (Trial Testimony of Catherine Slane, Docket No. 190 at 34). Defendant testified that she did not suspect Mr. Goggin or Mr. Kamaras were committing fraud, (*Id*. at 59), and that she "did not know anything about [the fraud]." (*Id*. at 74).

   b. Defendant testified that after she did the first one or two closings for Mr. Goggin, Mr. Goggin took a liking to Melissa McCauge and that Ms. McCauge "started mostly doing all his files." (*Id*. at 34-35).

   c. After explaining how she closed one of Peter Kamaras' deals, Defendant testified "absolutely not" when asked if she knew how Mr. Goggin made his fraud work. She continued by testifying that "[Mr. Kamaras and Mr. Goggin] defrauded me, too. They duped me big time." (*Id*. at 43-44).

   d. After Defendant was asked about whether she received calls from disgruntled customers, Defendant went off on a tangent, ultimately testifying that "never in my life did I know that there was any fraud going on." (*Id*. at 45-46)

   e. Defendant testified that she had "no idea" that Mr. Goggin was using loan proceeds as the buyers' down payments at the closings of the loans. (*Id*. at 48).

   f. Defendant testified that she thought that the settlement statements provided to lenders accurately reflected what was going on. (*Id*. at 55-56).

   g. In response to whether Defendant caused a wire transfer to go to Mr. Goggin in connection with the Allegheny Avenue transaction, and despite her signature and notary seal on the

documents for this transaction, Defendant denied disbursing the corresponding loan. (*Id*. at 97).

h.   Defendant testified that it was never her intention to lie or hide things from the lenders.  (Trial Testimony of Catherine Slane, Docket No. 191 at 34-35).

i.   At the time of the closings, Defendant testified that except for one time, she always asked for a down payment check from the buyers, *id*. at 42, despite numerous occasions where Mr. Goggin would bring the check on the following day, contrary to the lenders' instructions, *id*. at 43.

j.   Defendant testified that certain buyers, namely Sayeeida Polite, (*id*. at 68), Douglass Holloway and his mother Carole Diggs, (*id.* at 66), and Justin Mavilla provided false testimony before the jury. (*Id*.). Additionally, Defendant testified that Katie Grindle and Kristen Fitzgerald provided false testimony. (*Id*.)

k.   With respect to Douglass Holloway, Defendant testified that: (1) she was there when Mr. Holloway signed the documents; (2) Mr. Holloway "was upset that his credit got ruined"; and (3) Mr. Holloway purchased the house for his mother.  (*Id.* at 22).

Defendant argues that her testimony in which she denied knowledge of Mr. Goggin's and the others' fraudulent conduct was not untruthful and that this knowledge is not an element of proof and therefore, immaterial to the conspiracy charge. (Docket No. 203 at 5).   However, Defendant's position is plainly incorrect, because the jury convicted Defendant of conspiracy to commit wire fraud at Count One of the Indictment.  Although knowledge of coconspirators' actions is not explicitly an element of a conspiracy,[6] the Defendant must have knowingly joined the conspiracy intending to help further or achieve the goals or objectives of the conspiracy.   If Defendant was unaware of fraudulent actions by "Goggin and the others," she could not have knowingly joined the conspiracy. Therefore, these statements were especially material to the charge at Count One of the Indictment.

Defendant also asserted that she knew absolutely nothing involving the fraud by either Mr. Kamaras or Mr. Goggin, her

---

[6]   "To establish a charge of conspiracy, the Government must show (1) a shared unity of purpose, (2) an intent to achieve a common illegal goal, and (3) an agreement to work toward that goal, which [defendant] knowingly joined."  *United States v. Boria*, 592 F.3d 476, 481 (3d Cir. 2010).

coconspirators. (Docket No. 190 at 34, 43-46, 48, 59, 74). These statements are unsupported and directly contradict the evidence presented at trial. The trial testimony shows that Defendant was the manager of 1st Olympic Settlement Services, and had responsibility for disbursing all the loans and the checks associated with these loans. Defendant admitted that when Goggin first came to 1st Olympic Settlement, he had explained to her and Caesar DiSilvio how his business worked. (*Id*. at 35). As a result, Defendant then taught Katie Grindle how to close Mr. Goggin's loans and create two settlement statements for these transactions. (Docket No. 188 at 17-18, 23-24). It is also readily apparent that the jury discredited almost the entirety of Defendant's testimony in comparison with the testimony of the Government's witnesses and documentary evidence, because the jury found that the Defendant joined the conspiracy and was guilty of Count One of the Indictment. *See United States v. Ortiz*, 91 F. App'x 224, 225-26 (3d Cir. 2004) (holding that § 3C1.1 applied because "[Defendant's] claim that his testimony was not perjurious is belied by the record, which indicates that, in convicting [Defendant], the jury necessarily rejected his testimony that he was not involved in the crime, and credited the testimony of three witnesses who testified to the contrary.").

Defendant also denied disbursing the settlement statement related to the property at 170 Allegheny Avenue. (Docket No. 190 at 97; Government Exhibit FO-230). However, she admitted that it was her signature and notary seal on the documents, which resulted in a cash payment of $43,955 to Mr. Goggin. (*Id*. at 92-96). This wire transfer was directly at issue in Count Two of the Indictment, (Docket No. 1 at 12), which charged Defendant with wire fraud, and for which Defendant was found guilty, (Docket No. 137 at 1). *See United States v. Yaniro*, 303 F. App'x 100, 103 (3d Cir. 2008) (citing *United States v. Boggi*, 74 F.3d 470, 478-79 (3d Cir. 1996) ("The court is bound to accept facts that are necessarily implicit in a jury's verdict of guilty.")). Because the jury found Defendant to be guilty at Count Two, they implicitly found beyond a reasonable doubt that her testimony denying her role in the wire transfer to be untruthful. Accordingly, the Court finds that Defendant gave false testimony under oath.

Perhaps the most egregious example of Defendant's false testimony is that concerning Douglas Holloway and the Poketa Road transaction. Defendant testified that Mr. Holloway's testimony was false because he "was upset his credit got ruined." (Docket No. 191 at 22). She testified that she specifically recalled closing Mr. Holloway's transaction because Mr. Holloway arrived

at her office with his mother and signed all the documents in front of Defendant, including Government Exhibit FO-130. (*Id.* at 22-23). Mr. Holloway's testimony, however, makes it apparent that the documents that Mr. Holloway purportedly signed do not contain his actual signatures. During Mr. Holloway's testimony, counsel for the Defendant asked Mr. Holloway to sign a document in open Court two times, and both of these signatures were entered in evidence as Defense Exhibit 4. Even to the untrained eye, there are remarkable contrasts between Mr. Holloway's actual signature as contained in Defense Exhibit 4, and his purported signature in Government Exhibit FO-130. Besides the signatures looking nothing alike, it is clear that the signature in Government Exhibit FO-130 spells his last name as "Hallaway," as opposed to the proper spelling of "Holloway." Similarly, Government Exhibit FO-138, another document allegedly signed by Mr. Holloway in the closing of the Poketa Road transaction, does not match Defense Exhibit 4. Instead, Government Exhibit FO-138 resembles the forged signature in Government Exhibit FO-130, except that Mr. Holloway's name now appears to be spelled "Halloway." In sum, the Court finds that the documents for the Poketa Road transaction were not signed by Mr. Holloway. Furthermore, the Court found Mr. Holloway to be forthright, credible, and truthful throughout his trial testimony, unlike the Defendant. Therefore, Defendant did not witness Mr. Holloway signing these documents. Her testimony to the contrary was false.

Finally, based upon the Court's own impressions of Defendant on the stand, including her demeanor and actions, which the Court plainly observed in open court, it is clear that Defendant repeatedly and willfully gave false testimony. Defendant consistently tried to avoid answering questions, and the Court agrees with the jury's conclusion that she was not credible. Therefore, the Court holds that the two-level enhancement pursuant to Guideline § 3C1.1 is applicable.

(Docket No. 211).

The Court also made several additional findings concerning its observations of Defendant's demeanor while testifying and actions while participating at the trial in other portions of the record. *See e.g., Trial Trans. 4/10/13*; *Sent. Trans. 1/7/14*. In fact, the Court commented at a sidebar immediately after the Government's closing argument that Defendant was one of the most evasive witnesses she had ever encountered in 30 years of private practice

and six years on the bench at that point.  *See Trial Trans. 4/10/13* ("But in my 30 years of private practice and 6 years on the bench she's [one of] the most evasive people I've ever seen.  Relative to the medical records, we talked about this issue yesterday.  It's borderline, but the point is she's not credible.").  Later, at the first session of the sentencing, Defendant delivered her allocution to the Court explaining that it was "very difficult for [her] to accept" but that she was now able to accept the jury's verdict, acknowledging her guilt and the wrongfulness of her conduct before the Court for the first time.[7]  *Sent. Trans. 12/4/13.*  The sentencing team then advocated that her statement and change of position should support a more lenient sentence to which, of course, the Government disagreed.[8]  *See e.g.,* Docket Nos. 213; 228; *Sent. Trans. 1/10/14.*  The Court

---

[7]     Defendant continued her allocution stating, among other things:

> As for my wrongful conduct, again, I accept responsibility for what I did.  I admit that the settlement statements did not reflect what was known to be as the reality of the transactions.  I admit that I allowed down payments to be made after the actual closing.  I admit that I did not follow the proper procedures and that that was the wrong thing to do.
>
> I understand that people were directly affected and hurt by my actions and for that, I am deeply, deeply sorry.
>
> At the time, I failed to fully appreciate the harm of allowing nonpayments to be delivered the next day or allowing […] inaccurate settlement statements to be sent to the lenders because the buyers and the sellers themselves both knew Mr. Goggin was getting money from those.  That is how I justified it in my mind at the time.  **But I appreciate now after everything being put to light in a different way, in my mind, that there's no excuse for my actions.**  And they deeply, deeply affected others.

*Sent. Trans. 12/4/13* (emphasis added).

[8]     In this regard, Defendant's sentencing team advocated in her Sentencing Memorandum that:

> With a deep understanding of this Court's written observations and conclusions regarding the conduct that has brought her to this critical point, Mrs. Slane genuinely regrets the misconduct which led to her conviction. She now recognizes the myriad of consequences of her actions, including the damage that those actions visited upon the victims in this case. Mrs. Slane acknowledges that – more than merely an illegal act – she has violated the tenets of her faith; she accepts the wrongfulness of her conduct, feels deep sorrow for it, and understands the need for penance. This memorandum does not seek to excuse the conduct underlying Mrs. Slane's case. To the contrary, the purpose of this memorandum is to provide the "totality of the circumstances" surrounding Mrs. Slane and the offense to enable the Court to determine a fair and just sentence.

granted a variance, in part, but also expounded on its observations of Defendant's demeanor and

conduct during trial in response to such arguments, noting all of the following.

> Now, in addition I had to look at whether or not at this stage of the litigation in this case Ms. Slane is or is not remorseful. There's a relatively recent case called United States versus Howe that lets me consider whether a defendant's criminal conduct is isolated, whether it's contrary to the lifetime of […] otherwise lawful conduct. Here, this wasn't in effect isolated because there was a pattern of behavior that went on for a period of time so this in itself in my estimation can't be an aberration. As I noted a minute ago, there's little in the defendant's background that would lead anyone to believe that she would become involved in the kind of criminal conduct that occurred here. Instead, she did and as noted previously, we were dealing with […] approximately $3 million in loans, a loss that this court calculated as approaching a million dollars and to that end, 26 transactions and all the people that went with those transactions. The Court, too, remains very troubled by the fact that even when this case proceeded to trial, the defendant did not at all times testify in an honest and forthright manner. And the Court has made findings […] that the defendant has perjured herself in several instances.
>
> In addition to that, Mr. Conway made mention of it in his argument, […] as the Court sits here, Ms. Slane, I can distinctly recall repeatedly looks on your face, as if you were showing disdain for the victims in the case, disdain for those people who testified against you. And that also troubles the Court.
>
> Now, I weigh that against the fact that I have the authority to grant a variance based on post [offense] rehabilitation. There's a relatively recent case out of the United States Supreme Court Pepper versus United States, 2011 case and a subsequent case, United States versus [Diaz] of the Third Circuit, both of which make clear to me that I can consider post defense rehabilitation efforts under Section 3553(a) […] when I determine whether a variance is or isn't warranted in a particular case.
>
> Now, as I indicated in my supplemental findings and rulings, I have found that it is only now, that is, during these proceedings, that Ms. Slane has shown any kind of remorse and she did that by way of her sworn statement to the Court. That acknowledgement on her part took a long time coming. As I mentioned, during the

(Docket No. 213 at 1-2).

course of the trial, I didn't see a glimmer of that kind of an acknowledgement.

> Now, as I indicated in sum, the defendant's personal history and characteristics only in a small measure merit a downward variance and that's particularly relative to this post rehabilitation, post-conviction rehabilitation. You're going through whatever the therapy is that Ms. [Patricia] Strassner has prescribed for you, whatever the psychiatrist is doing, I didn't get any evidence on that, and given the fact that you now acknowledge that what was done here is wrong. Now admittedly during the course of trial on cross-examination, from time to time you admitted this, that and the other thing was false or wrong, but overall, during the course of the trial, and it's your prerogative to go to trial, your demeanor, some of the looks that you gave to those people who testified as victims in this case remains very troubling to this court.

*Sent. Trans. 1/10/14.*[9]

Defendant's denials of culpability and refusal to accept responsibility for her offenses after her indictment and through trial were similarly recognized by her therapist, Patricia Strassner, MSW, LCSW.[10] (Docket No. 213-1; *Sent Trans. 12/4/13*). Around the time she was indicted in April 2011, Defendant started participating in therapy with Ms. Strassner and continued seeing her regularly through her sentencing in January of 2014. (*Id.*). Ms. Strassner wrote a letter to the Court dated November 15, 2013 which Defendant relied upon in seeking the imposition of a sentence below the advisory guidelines range. In this letter, Ms. Strassner states that:

---

[9]     The Court made similar comments throughout the sentencing. *See also e.g., Sentencing Trans. 1/10/14* ("Ms. Slane, up until the very end, stood before this court as if she had done nothing wrong despite the fact that in black and white there was plenty of wrong."); ("I think it's only now that Ms. Slane has exhibited any iota of remorse. We did not see that any earlier in these proceedings."); ("So, despite, again, the contrite appearance that we've seen throughout these [sentencing] proceedings by Ms. Slane, what I saw during the course of this trial was to the contrary. What I saw was a woman who was in charge, actively participating, and as I noted earlier, she was also the oldest person in the office and to that end, perhaps she had some sway over these younger women in the office.").

[10]     As the Court stated on the record at the December 4, 2013 sentencing hearing, Ms. Strassner has a Masters in Social Work from the University of Pittsburgh with a Certificate in Gerontology. She has an LSW and an LCSW, and she received her undergraduate degree in Psychology from Chatham College, where she graduated cum laude. She has credentials from numerous health care providers in the Western District of Pennsylvania, and she has experience in areas of individual and family therapy, ADHD, and substance abuse. (Docket No. 227 at 3, n.1).

[Defendant] presents as an ethical, honest person. She described her interactions, and lack of interactions, with the employees involved in the case before you currently. **She struggled to understand why the assistant D.A. was so zealous in prosecuting her after she refused to plead guilty, taking this personally. The other employees involved in this case have tried to persuade Ms. Slane to take a "deal" with a guilty plea but she stated could not lie and say she had committed a crime when she had not. She could not understand how, when she had no interactions with those actually involved with the fraud, how she could be found guilty.** She described how shocked, devastated, and terrified she felt when the guilty verdict was delivered. In her typically naive style, she could not grasp how she could have been found guilty with no evidence of her being involved with any of the financial events constituting fraud. **She spent many sessions trying to comprehend how others could not see she was innocent of the crime. Her denial of any wrong doing and description of her job duties have remained consistent and never wavered.**

(Docket No. 213-1 at 3 (emphasis added)).   Ms. Strassner testified similarly during cross-examination at the first session of the sentencing hearing in December of 2013:

THE WITNESS: In working with Cathy before the trial -- I don't know how to answer that. I have never been in this phase of a trial like this. So I'm not sure how to answer it. I know words are very important here, and I know you all speak legalese. I speak "therapese," so bear with me.

As I have come to know Ms. Slane and her family. **She had no comprehension as to what she did wrong when we started out. And that was a genuine, sincere thing. I know I wasn't involved in the trial, I know I wasn't there, all I can do is speak from my point of view.**

Cathy's viewpoint of the world is if you're a good person, good things come to you. That's why she has had a lifelong history of doing good. A lot of people, they go to church and at one o'clock Sunday afternoon it's back on the shelf. She lives her faith. I don't think she has the ability to knowingly lie, cheat, steal, any of the big ten. It's so counter-indicated for her.

**I understand she's been convicted. And she was dumbfounded as to why, and we're working through that, and the attorneys are working with her and all that stuff, and I can't speak**

14

**directly to that because I haven't observed it.** But I think her
being incarcerated for doing that which she was trained to do and
assuming that she was being trained appropriately -- I know she
accepts the conviction, I know that she now knows that there were
some things that she did that were wrong, I understand that and she
accepts responsibility for that, but harming this child […] because
it will have a negative impact on [her] as well, it serves no good.
She is so traumatized by this entire process, and I see all these
people that can testify to personality qualities and traits 15, 20, 30
years, and it is so inconsistent with what she has been convicted of.
And personality is a consistent thing. You can't ask a sociopath to
come into court and, well, if you're a good person the next six
months and you're empathetic, so on and so forth, well, we'll just
let it go. Personalities are consistent traits. Will it serve any good
for her to go to jail? I don't think so.

I know I'm probably not answering your question, I just really
don't know how to answer your question, sir.

*Sent. Trans. 12/4/13* at 17-18.

Overall, the Court finds that at no time during any proceeding before this Court did
Defendant exhibit any willingness to plead guilty to any of the offenses charged. Defendant
refused to plead guilty and acted consistently with such refusal by telling her trial counsel that
she was innocent upon her indictment, and advising her therapist that she could not plead guilty
as friends and former coworkers had advised her to do because she was not capable of lying
about her role. She remained steadfast in this position throughout. In fact, her therapist advised
that she was "dumbfounded" at being convicted. *Sent Trans. 12/4/13.* Even during Defendant's
statement at her sentencing – which took place both after the Government's trial presentation of
evidence against her and the Court's findings that she lied, repeatedly, at trial — Defendant
admitted that it was "very difficult" for her to accept responsibility for her crimes and was able
to do so only after conferring with her expanded sentencing team as they apparently explained
her criminal culpability to her in a "different" way. *Id.* Of course, such admissions were made

at the eleventh hour for the purposes of mitigating and avoiding the imposition of an even lengthier prison sentence.

### C. Evidence and Allegations as to Plea Discussions

In direct contrast, and more likely than not because of all of the above, the evidence concerning plea discussions between the parties in this case is largely absent. The purported plea agreement offer from the Government contained in an email dated July 10, 2012 states only the following:

> Steve [Capone] – I am in Florida trying a case, and will not be back in the office until around August 10th. Would you consent to a continuance until I get back? It seems to me that we really do not need a hearing on these motions. What we really need is a trial date, as Slane seems determined to go to trial. Does that remain her position or is she open to a plea? The only thing I could do on a plea is limit the loss to less than $1,000,000. We will be seeking abuse of position of trust. If she goes to trial, we intend to seek all applicable enhancements – sophisticated means, number of victims, vulnerable victims, etc. For a plea, we could limit the enhancements to loss and abuse of a position of trust/special skill.
>
> Brendan [Conway]

(Docket No. 239-1). This email was then forwarded by trial counsel to Defendant, along with the following explanation:

> Cathy: See the email below that I rec'd from the prosecutor. I did a computation of the expected Sentencing Guideline range that would be applicable (as only advisory to the court, not mandatory) if you plead guilty vs. if you went to trial and were found guilty, and come up with the following: Option 1: Plead guilty pursuant to an agreement with the government = 41 to 51 months imprisonment; Option 2: Go to trial and be found guilty of all Counts = 70 to 87 months (or perhaps 57 to 71 months); Option 3: Go to trial and be found not guilty of any Counts = no sentence. These numbers are educated guesses, not predictions or promises. As we discussed, a lot of factors may or may not apply to increase or decrease the recommended sentencing range, and the judge could ultimately completely disregard the Guideline Range and sentence you to more or less time, or no time.

The bottom line is that you have to know what your (sic) facing.

I intend to tell Mr. Conway that I do not object to his request to ask that the July 18th Court hearing be continued, and that I will get back to him to discuss your intentions regarding deciding whether to discuss a plea bargain or go to trial.

Please call tomorrow (Thursday) after 11:00 am and before 1:30 to discuss this. Also, which email address should I use to contact you?

Steve Capone

(*Id.*).  Defendant admits that she received and reviewed this email from her trial counsel (along with the prosecutor's email) and spoke with him as noted in the email.  (Docket No. 239).  She now asserts, through her pro bono counsel, that she received "no counseling whatsoever" about whether to accept the Government's emailed plea offer or not.  (*Id.*).  But, she has not repudiated trial counsel's statements in the email that they had prior discussions concerning the Sentencing Guidelines which he pointed out were advisory and not mandatory.  (*Id.*).  In addition, she has not averred that she had any misunderstanding that he was providing only estimations through his email stating "[t]hese numbers are educated guesses, not predictions or promises. As we discussed, a lot of factors may or may not apply to increase or decrease the recommended sentencing range, and the judge could ultimately completely disregard the Guideline Range and sentence you to more or less time, or no time." (*Id.*).  Defendant also admits that she rejected the overture to discuss a plea bargain with the Government.[11] (*Id.*).

It appears that the next discussion of plea offers between the parties occurred at the final pretrial conference.  (Docket Nos. 239, 241, 244).  Near the conclusion of said three and a half hour proceeding, the Court advised that it would be engaging Defendant in a colloquy

---

[11]      Accordingly, the Court proceeded to the hearing on pretrial motions, entered its order resolving such motions sometime thereafter and later set the matter for trial commencing on April 1, 2013.  (*See e.g.*, Docket Nos. 96-97; 103-106; 108-109).

concerning her understanding of prior plea agreement offers in the case. (Docket No. 238). Trial counsel asked for a few minutes to discuss same with Defendant which the Court granted and left the bench, exiting the courtroom. (*Id.*). Defendant alleges that during this break her trial counsel asked her if she was willing to plead guilty if she would receive a sentence of probation and that she advised him she was willing to do so. (Docket No. 239). She adds that trial counsel then approached Government counsel with this offer of a guilty plea in exchange for a probationary sentence and the Government rejected same. (*Id.*). This account is confirmed by the Government's response. (Docket No. 241).

Unaware of this interaction, the Court then returned to the Bench and engaged in the following colloquy with Defendant:

> Let's let the record reflect that Mr. Capone and his client, Miss Slane, had an opportunity to discuss the case at hand in private. We're now resuming on the court's record.
>
> Miss Slane, as I indicated to you prior to the break, in light of two recent decisions of the Supreme Court, Missouri versus Frye, a Supreme Court decision in 2012 at 132 Supreme Court 1399, and Lafler versus Cooper, another Supreme Court decision in 2012, 132 Supreme Court 1376, in light of those two decisions and analysis of same, it's my opinion that they suggest that a District Court has a duty to determine that all formal plea agreement offers made by the Government to defense counsel were communicated to the Defendant and that he or she understands the consequences of rejecting such offers and proceeding to trial in the case.
>
> Now, as you know and as I said earlier, this case is set to commence immediately following jury selection on Monday, April 1, 2013, at 9:30 in the morning. Hence, in light of these circumstances, I must now inquire of you, Miss Slane.
>
> …
>
> CATHERINE SLANE, the Defendant herein, having been first duly sworn, was examined and testified as follows:
>
> EXAMINATION

THE COURT: All right. First, Miss Slane, pull the microphone over to you so that you can be heard. Okay.

Thank you, Mr. Capone.

Miss Slane, do you understand that having declared and affirmed, your answers to my questions are subject to the penalties of perjury or of making a false statement if you do not answer truthfully?

DEFENDANT SLANE: Yes, Your Honor.

THE COURT: Okay. Would you please state your full name.

DEFENDANT SLANE: Catherine Slane.

THE COURT: And how old are you at present?

DEFENDANT SLANE: Fifty-three.

THE COURT: Tell me about your educational background.

DEFENDANT SLANE: I have a high school degree and I attended some classes at CCAC, that's all.

THE COURT: Classes at CCAC.

DEFENDANT SLANE: Yes.

THE COURT: What kind of classes?

DEFENDANT SLANE: Accounting.

THE COURT: Ever studied law, paralegal?

DEFENDANT SLANE: No.

THE COURT: Real estate?

DEFENDANT SLANE: No.

THE COURT: Have you been able to communicate with your attorney, Mr. Capone, without any problem?

DEFENDANT SLANE: Yes.

THE COURT: Mr. Capone, have you been able to communicate with the Defendant, Miss Slane, without any problem?

MR. CAPONE: Yes, Your Honor.

…

THE COURT: Mr. Capone, do you have any doubt as to Ms. Slane's competence to continue to participate in today's proceedings?

MR. CAPONE: No, Your Honor.

THE COURT: Okay. Miss Slane, based on your appearance, based on your demeanor, based on your responses to my questions, all of which I find to be adequate, based on the fact that for the last three and a half hours you've been here in my courtroom participating fully in a pretrial conference, and your attorney's representations as an officer of the court, I find that you are competent to meaningfully participate in this colloquy with the Court about any potential plea agreement.

Now, Miss Slane, you understand you're charged at Count 1 with one count of wire fraud conspiracy in violation of Title 18, United States Code, Section 134. You understand that?

DEFENDANT SLANE: Yes, Your Honor.

THE COURT: You also understand you are charged at Counts 2, 5, 7 and 8 with four counts of wire fraud in violation of Title 18, United States Code, Section 1343.

DEFENDANT SLANE: Yes, Your Honor.

THE COURT: Okay. And you understand that your case is scheduled to start trial on Monday, April 1, 2013, on all of those counts that we've just reviewed.

DEFENDANT SLANE: Yes.

THE COURT: Okay.

Mr. Conway, let me turn to you. Did the Government tender to Mr. Capone any formal plea agreement offers as to Counts 1, 2, 5, 7 or 8 in the indictment?

MR. CONWAY: No formal plea offers, Your Honor, no.

THE COURT: Okay. Mr. Capone, are you in agreement with Mr. Conway's statement to the Court?

MR. CAPONE: Yes, Your Honor.

THE COURT: Okay. To the extent that you had any discussions with Mr. Conway about plea agreements and negotiations related to same, did you communicate all of that to Miss Slane?

MR. CAPONE: Yes, Your Honor.

THE COURT: Okay. Miss Slane, has Mr. Capone kept you up-to-date on any discussions that he may have had with Mr. Conway about plea agreements and/or the like?

DEFENDANT SLANE: Yes, Your Honor.

THE COURT: And you understand there has never been a formal plea agreement in your case.

DEFENDANT SLANE: Yes, Your Honor.

THE COURT: You're nodding your head yes.

Okay. Are there any other matters that either counsel would like to put on the record vis-a-vis the Court's colloquy? Any additional questions that you think need to be posed or not? I think the Court is satisfied with what I have heard.

MR. CONWAY: Nothing further from the Government, Your Honor.

MR. CAPONE: Nothing, Your Honor, thank you.

THE COURT: So then this closes out this colloquy.

(Docket No. 238).

Despite her affirmance, under oath, that she understood the charges, was prepared for trial and that there was no formal plea agreement offer in her case, Defendant now seeks to enforce the alleged terms of the July 10, 2012 email through her § 2255 Motion. (Docket No.

238).  She alleges that had she "been properly advised, she would have realized her culpability and the weight of the evidence and accepted the United States' plea offer."  (*Id.* at ¶ 93).  She claims that her trial counsel was deficient in the following areas:

> a. The failure to have adequately reviewed the United States' evidence at the time of plea discussions, rendering trial defense counsel uninformed when he presented the plea offer to Mrs. Slane;
>
> b. The failure to accurately advise Mrs. Slane regarding her sentencing exposure based on the sentencing guidelines as applied to the United States' plea offer, mistakenly advising Mrs. Slane that the sentencing guidelines under the United States' plea offer presented a sentencing range were higher than they really were;
>
> c. The failure to accurately advise Mrs. Slane of the fact that a plea [of] guilty would provide a far better opportunity to receive a sentence substantially less than the applicable sentencing guidelines;
>
> d. The failure to accurately advise Mrs. Slane regarding her sentencing exposure based on the sentencing guidelines that would apply if Mrs. Slane did not accept the plea offer and chose instead to proceed to trial, mistakenly advising Mrs. Slane that the sentencing guidelines applicable at trial were lower than they really were;
>
> e. The failure to accurately advise Mrs. Slane regarding the risks of proceeding to trial in light of the United States' evidence;
>
> f. The failure to advise Mrs. Slane in a way that would give her an appropriate understanding of how the evidence to be presented by the United States would demonstrated her culpability;
>
> g. The failure to advise Mrs. Slane regarding the relevant law, including the law of conspiracy, such that she was oriented to the risks of proceeding to trial in light of the United States' evidence; and
>
> h. The failure to advise Mrs. Slane as to how the law and evidence would impact the likely finding by a reasonable jury.

(Docket No. 239).

Defendant filed her Motion through her pro bono counsel on July 14, 2014 along with a verification signed by her dated June 25, 2014. (Docket No. 239). The Government responded filing a lengthy Response dated August 13, 2014. (Docket No. 241). Defendant then filed a Reply dated August 27, 2014. (Docket No. 244). In light of the parties' arguments and the significant record in this case, the Court has taken the time necessary for it to fully review the matter and carefully consider all of the parties' arguments.

III.    LEGAL STANDARD

A prisoner in federal custody may move to vacate his or her sentence under 28 U.S.C. § 2255(a) if such "sentence was imposed in violation of the Constitution or laws of the United States. 28 U.S.C. § 2255(a). "A prisoner seeking relief on the grounds of ineffective assistance of counsel bears the burden to demonstrate two requirements," *United States v. Seeley*, 574 F. App'x 75, 78 (3d Cir. 2014), which were initially set forth by the Supreme Court of the United States in *Strickland v. Washington*, 466 U.S. 668 (1984). In order to prevail on a claim of ineffective assistance of counsel under *Strickland*, a defendant "must establish that (1) the performance of counsel fell below an objective standard of reasonableness; and, (2) counsel's deficient performance prejudiced the defense." *United States v. Otero*, 502 F.3d 331, 334 (3d Cir. 2007) (citing *Strickland*, 466 U.S. at 688, 694); *see also Roe v. Flores-Ortega*, 528 U.S. 470, 476-477 (2000) (citing *Strickland*, 466 U.S. at 688, 694) (same). The United States Court of Appeals for the Third Circuit has "endorsed the practical suggestion in *Strickland* [that the Court may] consider the prejudice prong before examining the performance of counsel prong 'because this course of action is less burdensome to defense counsel.'" *United States v. Lilly*, 536 F.3d 190, 196 (3d Cir. 2008) (quoting *United States v. Booth*, 432 F.3d 542, 546 (3d Cir. 2005), *which quoted United States v. McCoy*, 410 F.3d 124, 132 n. 6 (3d Cir.2005)); *see also Strickland*, 466

U.S. at 697, 104 S.Ct. 2052 ("If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed.").

Generally, a district court must order an evidentiary hearing in a federal habeas case if a criminal defendant's § 2255 allegations raise an issue of material fact. *United States v. Biberfeld*, 957 F.2d 98, 102 (3d Cir.1992). But, if there is "no legally cognizable claim or the factual matters raised by the motion may be susceptible of resolution through the district judge's review of the motion and records in the case," the motion may be decided without a hearing. *United States v. Costanzo*, 625 F.2d 465, 470 (3d Cir. 1980); *see also Lilly*, 536 F.3d at 195. If a hearing is not held, the district judge must accept the criminal defendant's allegations as true "unless they are clearly frivolous on the basis of the existing record." *Gov't of Virgin Islands v. Bradshaw*, 726 F.2d 115, 117 (3d Cir. 1984). Similarly, "vague and conclusory allegations contained in a § 2255 petition may be disposed of without further investigation." *United States v. Knight*, 2009 WL 275596, at *13 (W.D. Pa. 2009) (quoting *United States v. Thomas*, 221 F.3d 430, 437 (3d Cir. 2000)). The Court resolves the pending motion without holding a hearing because, for the reasons set forth *infra,* the uncontroverted evidence of record firmly demonstrates that Defendant cannot establish that she was prejudiced by the alleged deficient performance of her trial counsel. *See Lilly*, 536 F.3d at 197 ("Because Lilly has failed to establish that this advice prejudiced him in a way that 'undermines confidence in the outcome,' *Strickland*, 466 U.S. at 694, 104 S.Ct. 2052, we conclude that the District Court did not abuse its discretion in declining to hold an evidentiary hearing before denying his claim.").

IV.    DISCUSSION

As noted, Defendant was convicted at trial and now maintains that she received ineffective assistance from her trial counsel with respect to her consideration of a plea offer purportedly made by the Government.  (Docket Nos. 239; 241).  Her claims are wide-ranging challenging nearly all aspects of her trial counsel's performance after he received an email from the prosecutor eight (8) months prior to trial asking whether she was "open to a plea" and suggesting the "only thing [he] could" do in a potential plea agreement would be to limit certain sentencing enhancements.    (*Id.*).  But, Defendant lodges these complaints without even specifically alleging that she would have pled guilty to the terms of the alleged offer or that she ever authorized her trial counsel to engage in plea negotiations with the Government on her behalf.  (*Id.*).  In essence, Defendant asserts that her trial counsel was unable to convince her to plead guilty and accept responsibility for her criminal conduct.  (*Id.*).  Defendant believes that she was prejudiced by her trial counsel's performance because she was convicted at trial and ultimately sentenced to sixty (60) months' incarceration when she could have received a lower sentence if she had engaged the United States in plea negotiations and pled guilty to her crimes. (*Id.*).    The Government responds that Defendant cannot meet her burden to demonstrate prejudice.  (Docket No. 241).

Having presided over this matter from the outset, during which the Court keenly observed Defendant's behavior and testimony including her profound assertions of innocence and repeated refusals to accept responsibility for her criminal behavior – much of which the Court found to be false and misleading, findings that Defendant basically confirmed during her sentencing allocution when she finally acknowledged her role in the mortgage fraud, the Court holds that Defendant cannot establish that she was prejudiced by the alleged deficient performance of her

trial counsel because there is simply not a reasonable probability that she would have pled guilty and accepted responsibility for her criminal behavior prior to her trial. Indeed, all of the evidence demonstrates otherwise and her allegations at this stage are insufficient to overcome the significant record against her position on the plea issues.

The Supreme Court of the United States recognized in *Frye* and *Lafler* that the Sixth Amendment right to counsel provides that an accused is entitled to the effective assistance of counsel at all phases of the prosecution of criminal charges, *see Missouri v. Frye*, 132 S. Ct. 1399, 1404 (2012), including during the plea-bargaining process and the entry of a guilty plea. *Lafler v. Cooper*, 132 S.Ct. 1376, 1384 (2012). The Supreme Court held in *Frye* that a criminal defense lawyer was constitutionally ineffective for failing to communicate a plea agreement offer to his client and expounded in *Lafler* that "[i]f a plea bargain has been offered, a defendant has the right to effective assistance of counsel in considering whether to accept it." Counsel is required to "give a defendant information sufficient 'to make a reasonably informed decision whether to accept a plea offer.'" *Shotts v. Wetzel*, 724 F.3d 364, 376 (3d Cir. 2013) (quoting *United States v. Day*, 969 F.2d 39, 43 (3d Cir. 1992)). A court may find counsel to be ineffective when the advice given is "so incorrect and so insufficient that it undermined the defendant's ability to make an intelligent decision."[12] *Day*, 969 F.2d at 43.

---

[12] The Court notes that many "[c]ourts have looked to the ABA Standards for Criminal Justice 'as guides to determining what is reasonable' under prevailing professional norms." *United States v. Shumaker*, 2011 U.S. Dist. LEXIS 31994 (W.D. Pa. Mar. 28, 2011) (citing *Rompilla v. Beard*, 545 U.S. 374, 387, 125 S. Ct. 2456, 162 L. Ed. 2d 360 (2005), *which quoted Strickland*, 466 U.S. at 688)). Relevant here, ABA Standard 14- 3.2, "Responsibilities of defense counsel" states that:

> (a) Defense counsel should keep the defendant advised of developments arising out of plea discussions conducted with the prosecuting attorney, and should promptly communicate and explain to the defendant all plea offers made by the prosecuting attorney.

> (b) To aid the defendant in reaching a decision, defense counsel, after appropriate investigation, should advise the defendant of the alternatives available and address considerations deemed important by defense counsel or

When a plea is rejected, "[h]aving to stand trial, not choosing to waive it, is the prejudice alleged." *Lafler*, 132 S.Ct. at 1385. In order to prove prejudice where a defendant alleges inadequate advice in considering a plea offer,

> a defendant must show that but for the ineffective advice of counsel there is a reasonable probability that the plea offer would have been presented to the court (i.e., that the defendant would have accepted the plea and the prosecution would not have withdrawn it in light of intervening circumstances), that the court would have accepted its terms, and that the conviction or sentence, or both, under the offer's terms would have been less severe than under the judgment and sentence that in fact were imposed.

*Id.; see also United States v. Seeley*, 13-2083, 574 F. App'x 75 (3d Cir. 2014) (quoting same). Thus, Defendant's burden to demonstrate prejudice in this context is multi-faceted and requires a showing of a reasonable probability of each of the following: (1) a plea offer by the Government; (2) that the prosecution would not have rescinded such offer in light of intervening circumstances; (3) that she would have agreed to the terms of such offer; and, (4) that the Court would have accepted such plea agreement and imposed a less severe judgment and sentence than

---

the defendant in reaching a decision. Defense counsel should not recommend to a defendant acceptance of a plea unless appropriate investigation and study of the case has been completed.

  (c) Defense counsel should conclude a plea agreement only with the consent of the defendant, and should ensure that the decision whether to enter a plea of guilty or nolo contendere is ultimately made by the defendant.

  (d) Defense counsel should not knowingly make false statements or representations as to law or fact in the course of plea discussions with the prosecuting attorney.

  (e) At the outset of a case, and whenever the law, nature and circumstances of the case permit, defense counsel should explore the possibility of a diversion of the case from the criminal process.

  (f) To the extent possible, defense counsel should determine and advise the defendant, sufficiently in advance of the entry of any plea, as to the possible collateral consequences that might ensue from entry of the contemplated plea.

ABA Standard 14- 3.2. Responsibilities of defense counsel.

was imposed at the challenged sentencing. *Id.* The Court focuses its discussion on the first and third factors as neither has been sufficiently alleged to warrant relief in this case in light of the established record.

### A. Alleged Plea Offer

The first issue is whether there was a plea offer made by the Government as Defendant points only to the prosecutor's July 2012 email which, at most, described the general parameters of what the prosecutor "could do" in a plea agreement if Defendant was interested in pleading guilty. (Docket Nos. 239, 241, 244). Again, Defendant admits that she was not interested in this proposal; although she characterizes her actions as "rejecting" the offer. (Docket No. 239). She claims that this decision was misinformed due to her trial counsel's alleged deficient performance estimating the advisory guidelines range in the subsequent email he sent to her and their brief follow up discussion, further averring that she received "no counseling whatsoever" by her trial counsel regarding these emails. (*Id.*). The Government acknowledges that the initial email was sent but maintains that its contents did not rise to the level of a formal plea agreement offer by the United States Attorney, a fact which Defendant and her counsel confirmed at the final pretrial conference. (Docket No. 241). The Court agrees with the Government that the cited email did not rise to the level of a plea offer.

The law is well established that "defendants have 'no right to be offered a plea," and "[i]f no plea offer is made … [ineffective assistance of counsel] simply does not arise." *Lafler*, 132 S.Ct. at 1385. Further,

> [t]he existence of a plea offer is a factual determination. *See Guerrero v. United States*, 383 F.3d 409, 417 (6th Cir. 2004). Plea offers are examined under the same standards as other contracts. *Puckett v. United States*, 556 U.S. 129, 137, 129 S.Ct. 1423, 173 L.Ed.2d 266 (2009); *United States v. Moscahlaidis*, 868 F.2d 1357

(3d Cir. 1989); *United States v. Odachyan*, No. 11–50253, 2014 WL 1491885 (9th Cir. Apr.17, 2014).

*Herrera-Genao v. United States*, No. CIV. 12-6119, 2014 WL 6386807, at *8 (D.N.J. Nov. 14, 2014); *see also United States v. Podlucky*, No. CA 13-1451, 2014 WL 7369841, at *3 (W.D. Pa. Dec. 29, 2014) ("As noted, in construing a plea agreement, the general principles of contract law apply."). Like other contractual offers, plea offers may be oral or written and, if in writing, need not be set forth in any particular form. *See United States v. Sanchez*, 562 F.3d 275, 280 (3d Cir. 2009) (overruled on other grounds) ("Just as contracts are not invalid simply because they are made orally, the same is true of plea agreements."). Hence, the fact that the communication was in an email rather than the standard form typically utilized by the U.S. Attorney in this District is not controlling. Additionally, the Court does not believe that the U.S. Attorney's Office internal definition of a "formal plea agreement offer" as consisting of only a written agreement signed by the United States Attorney is dispositive in determining whether an "offer" was extended to Defendant. *See United States v. Kubini, et al.*, Crim. No. 11-14, Docket No. 282 at 5 (W.D. Pa. Sept. 18, 2014) ("After engaging in numerous of these types of colloquies, it is clear that the United States Attorney's Office in this District takes the position that a 'formal plea agreement' offer is only a written agreement signed by the United States Attorney.").

Instead, all purported offers are analyzed under general contract law principles, pursuant to which communications concerning preliminary negotiations do not rise to the level of an offer unless the parties manifest an intention to be bound to terms set forth in the communication which are sufficiently definite and complete. *See Reed v. Pittsburgh Bd. of Public Educ.*, 862 A.2d 131, 135 (Pa. Commw. Ct. Nov. 18, 2004) (quoting Restatement (Second) of Contracts § 26 (1979)) ("A manifestation of willingness to enter into a bargain is not an offer if the person to whom it is addressed knows or has reason to know that the person making it does

not intend to conclude a bargain until he has made a further manifestation of assent."); *cf.*
*Podlucky*, 2014 WL 7369841, at *3 ("Under general contract law, 'agreements to agree' are not
generally enforceable."). "Incompleteness of terms is one of the primary reasons statements of
preliminary negotiation are not deemed offers." *Id.* at 136 (citing RESTATEMENT (SECOND) OF
CONTRACTS § 33 cmt. c (1979)). Rather, "[a]n agreement is definite if it indicates that parties
intended to make a contract and if there is an appropriate basis upon which a court can fashion a
remedy." *Id.* at 135 (quoting *Biddle v. Johnsonbaugh*, 664 A.2d 159, 163 (Pa. Super. Ct. 1995)).
"If a court, due to indefiniteness or incompleteness, is unable to determine if a contract was
performed, the court must find no contract existed in the first place." *Id.* (citing *Ingrassia
Constr. Co., Inc. v. Walsh*, 486 A.2d 478 (Pa. Super. Ct. 1984)). Issues of contract formation and
specific enforcement thereof are matters of law for the Court. *See e.g.*, *United States v.
Gonzalez*, 918 F.2d 1129, 1133-34 (3d Cir. 1990) (denying enforcement of plea agreement offer
that was withdrawn by the prosecution and holding that an "agreement was never reached, the
proposal was withdrawn and the agreement was never presented to the district court. It is
axiomatic that a plea agreement is neither binding nor enforceable until it is accepted in open
court.").

In this Court's estimation, the language of the email constitutes an invitation to negotiate
and not an enforceable offer. "A manifestation of willingness to enter into a bargain is not an
offer if the person to whom it is addressed knows or has reason to know that the person making it
does not intend to conclude a bargain until he has made a further manifestation of assent." *Reed*,
862 A.2d at 135 (quoting RESTATEMENT (SECOND) OF CONTRACTS § 26 (1979)). In his email,
the prosecutor clearly asked trial counsel the threshold question of whether Defendant was still
"determined to go to trial" or if she was now "open to a plea." (*See* Docket No. 239-1 ("What

we really need is a trial date, as Slane seems determined to go to trial. Does that remain her position or is she open to a plea?")). The Assistant United States Attorney then continues that the "only thing [he] could do" would be to limit the applicable enhancements to a loss amount under $1,000,000.00 and abuse of position of trust, without specifying any section of the guidelines. *Id.* Trial counsel's email to Defendant also shows that he did not believe this communication was a plea offer as he states "I intend to tell Mr. Conway […] that I will get back to him to discuss your intentions regarding deciding whether to discuss a plea bargain or go to trial." (Docket No. 239-1). Based on a plain reading of the email communications, the only reasonable interpretation of the prosecutor's email is that he was willing to negotiate a plea agreement within the general parameters noted *if* trial counsel advised that Defendant was open to considering a guilty plea and trial counsel shared the same view of the communication, advising his client that his eventual response to the prosecutor would answer that threshold question. *See United States v. Davenport*, --- F.3d ---, 2015 WL 64698, at *3 (3d Cir. Jan. 6, 2015) (in construing plea agreements, courts "look to the plain meaning of the plea agreement and eschew a 'rigidly literal' interpretation of it"). Therefore, the Court concludes that the July 2012 email is not an offer for a plea but an invitation to negotiate a plea agreement and start the plea bargaining process.

As the Government points out, the language of the email is also incomplete as a plea offer for numerous reasons since it contains no discussion about which of the five charges Defendant would enter a guilty plea and does not set forth any of the other terms that are typically included in plea agreements. (*See* Docket No. 241). It is further apparent that the language of the prosecutor's email is indefinite because three separate opinions have been provided by experienced federal criminal practitioners about what the resulting advisory

31

guidelines range would have been under the terms noted in the email. (*See* Docket Nos. 239-1; 239; 241). To this end, in July 2012, while explicitly noting that he was providing Defendant with an "estimate" and not giving her any guarantees or promises, Defendant's trial counsel calculated the advisory guidelines range if Defendant agreed to plead guilty as forty-one (41) to fifty-one (51) months. (Docket No. 239-1). In the post-sentencing § 2255 Motion filed two years later, Defendant's pro bono counsel advocates that the advisory guidelines range under the email would have resulted in a range of thirty (30) to thirty-seven (37) months. (Docket No. 239). In response, the prosecutor who authored the email counters that the advisory guidelines range would have been thirty-three (33) to forty-one (41) months. (Docket No. 241). As all parties agree that Defendant had no prior criminal history, this disconnect involves a dispute of whether Defendant's total offense level would have been 19, 20, or 21; i.e., a three-level disparity in the potential offense level.

But, disagreements regarding the advisory guidelines range (including underlying disputes concerning total offense levels and criminal history categories) among parties are commonplace, such that they are often litigated at sentencing. Further, the fact that parties dispute the applicable range, or that counsel miscalculates such range prior to a guilty plea, does not render a plea unknowing and involuntary, as long as counsel advises that the ranges proffered are estimates and correctly advises the client about statutory sentencing exposure. *See e.g., United States v. Hardy*, Crim. No. 09-151, Civ. A. No. 13-355, 2013 WL 3830507, at *10 (W.D. Pa. July 23, 2013) ("counsel's representation is not constitutionally deficient if he advises his client of an estimated advisory guidelines range that is later incorrect if Defendant understands it was an estimate and is correctly advised of the potential statutory penalties for the offense."). Here, trial counsel's email to Defendant clearly states that "[t]hese numbers are educated

guesses, not predictions or promises. As we discussed, a lot of factors may or may not apply to increase or decrease the recommended sentencing range, and **the judge could ultimately completely disregard the Guideline Range and sentence you to more or less time, or no time.**" (Docket No. 239-1 (emphasis added)).  Defendant admits that she read[13] and received the email and does not even allege that she misunderstood that she was being provided with estimates or that she was told by her trial counsel in the email that the Court had discretion to sentence her to "no time" if she pled guilty.  (Docket No. 239).  She likewise has not averred that she was unaware that she was potentially subject to a sentence of up to 20 years' incarceration at each of the charged counts pursuant to the applicable statutes. *See* 18 U.S.C. §§ 3143, 3149.

Defendant further challenges the accuracy of the advisory guidelines range provided by trial counsel in the event that she was convicted at trial, claiming that he grossly underestimated the eventual advisory guidelines range of 151-188 months' imprisonment.  (*Id.*).  While it is true that trial counsel's estimates of the advisory guidelines range in the event of a conviction, i.e., "Option 2" of "70 to 87 months (or perhaps 57 to 71 months)," were considerably lower than the Court's eventual computation, Defendant does not fully embrace the actual sentencing conflicts between the parties that led to the Court's final calculations.  The Probation Office's initial calculation of the advisory guidelines range in the PIR was 87 to 108 months or only two offense levels higher than the range noted in trial counsel's initial estimate.  (Docket No. 172).  But, the Probation Office's calculation included a two-level enhancement for obstruction of justice under Guideline § 3C1.1 due to Defendant's commission of perjury during trial.  (*Id.*).  Prior to the entry of appearances by pro bono counsel in this case, the only dispute between the parties was the applicability of the two-level enhancement under Guideline § 3C1.1, which, if resolved in

---

[13]    Defendant has a high school degree and earned licenses in title insurance and as a notary public.  (*See PIR*, Docket No. 172 at ¶¶ 47-48).   She previously held positions in a law office and conducted real estate closings for several years.  (*Id.* at ¶¶ 49-50).

Defendant's favor, would have resulted in an advisory guidelines range of 70 to 87 months or the estimated range provided in trial counsel's July 2012 email. (Docket Nos. 179; 185). Even if Defendant lost this dispute, which she did, the advisory guidelines range would have been 87 to 108 months as reflected in the PIR. (Docket No. 172). So, the Court cannot find trial counsel's performance ineffective when his pretrial estimate was generally accurate aside from the fact that he did not include a two-level enhancement which was applied only as a result of Defendant's own subsequent misconduct by testifying falsely about material matters at trial. Additionally, Defendant was sentenced to 60 months in custody or within the lower of the two possible ranges trial counsel provided Defendant as an estimate of a possible sentence after a conviction. (*See* Docket No. 239-1).

In any event, many courts faced with determining whether these types of preliminary communications constitute a formal plea offer have avoided this issue altogether and assumed that such communications did rise to the level of a plea offer. *United States v. Barndt*, 2:09-CR-325-05, 2014 WL 4187983 (W.D. Pa. Aug. 22, 2014) (McVerry, J.) ("The Court need not dwell on the lack of a formal offer, however. Even if the Court construes the preliminary communications between the AUSA and Barndt's counsel as an offer, the Court would still conclude that he has not plausibly alleged that he would have pled guilty pursuant to the offer's terms—his self-serving affidavit to that effect notwithstanding."). This Court will take the same course and continue to analyze the purported offer under the other relevant factors noted in *Lafler*, as is explained below.

However, before moving on to this issue, the Court will briefly address the defense's attack on the Court's pretrial procedures and its use of the standard prior plea offers colloquy that has been adopted by the members of this Bench. *See e.g.*, *United States v. Bacon*, Crim. No. 11-

34

42, Docket No. 1222 at 32-33 (W.D. Pa. May 28, 2013) (Schwab, J.). In *Frye*, the Supreme

Court recommended the following:

> [t]he prosecution and the trial courts may adopt some measures to help ensure against late, frivolous, or fabricated claims after a later, less advantageous plea offer has been accepted or after a trial leading to conviction with resulting harsh consequences. **First, the fact of a formal offer means that its terms and its processing can be documented so that what took place in the negotiation process becomes more clear if some later inquiry turns on the conduct of earlier pretrial negotiations**. Second, States may elect to follow rules that all offers must be in writing, again to ensure against later misunderstandings or fabricated charges. **Third, formal offers can be made part of the record at any subsequent plea proceeding or before a trial on the merits, all to ensure that a defendant has been fully advised before those further proceedings commence.**

*See Frye*, 132 S. Ct. at 1408-09 (emphasis added). In this case, the Court followed the Supreme

Court's advice and conducted a colloquy with Defendant about the existence of any prior plea

offers prior to the commencement of trial.[14] (Docket No. 238). At that point, Defendant, her

trial counsel and the prosecutor all agreed, on the record, that no formal plea agreement offer had

---

[14]    As noted in *United States v. Kubini, et al.*, this Court's standard practice involves the following:

> After determining that the Defendant is competent through a series of standard background questions, the Court's questions on prior plea offers are limited in scope to asking the following:
>
> •    Whether the Government has made any formal plea agreement offer(s) to the defense and ascertaining whether defense counsel agrees with the response;
>
> •    Whether the defense attorney has communicated the plea agreement offer(s) and explained it to the defendant and ascertaining whether the defendant agrees with his/her counsel's response; and,
>
> •    If there was an offer, whether the defendant rejected it.
>
> Follow-up questions are asked when warranted, although the Court is careful to elicit only factual information from the parties and the defendant rather than soliciting any advice provided by defense counsel to the defendant and protected by the attorney-client privilege. The Court also offers no opinion on the merits of any offer by the Government and/or the decision to reject same.

*United States v. Kubini, et al.*, Crim. No. 11-14, Docket No. 282 at 4-5 (W.D. Pa. Sept. 18, 2014).

been made by the Government to Defendant. (*Id.*).

The parties debate the legal import and sufficiency of the Court's colloquy, particularly the Court's usage of the phrase "formal offer" in its questioning. (Docket Nos. 239, 241, 244). In all, the Court generally agrees with the defense that such colloquy is not sufficient, by itself, to fully defeat the present § 2255 motion. But, Defendant has not repudiated her statement that she understood that there were no formal plea agreement offers in her case. (*See* Docket Nos. 239, 244). Hence, her sworn statement is entitled to great deference as "'[s]olemn declarations in open court carry a strong presumption of verity.'" *United States v. Schwartz*, 403 F. App'x 781, 784 (3d Cir. 2010) (quoting *Blackledge v. Allison*, 431 U.S. 63, 74 (1977)). And, her statement on this point is persuasive evidence that she did not believe that the July 2012 email constituted a plea agreement offer from the Government. (Docket No. 238 at 103). Likewise, the attorneys for both parties, as officers of the court, each represented that there were no plea agreement offers, which similarly supports a finding that they did not believe that the described email constituted a plea offer. (*Id.* at 102-103). After asking these questions to Defendant and the attorneys individually, the Court provided all with an opportunity to clarify or expound on their positions and they all declined to do so. (*Id.* at 103). Hence, the Court's colloquy with Defendant and the attorneys provides significant corroboration to the finding that no plea offers were extended to Defendant.

For these reasons, the Court holds that no plea offer was made in the July 2012 email as the terms were not sufficient to constitute an offer under general contract law, and the verified allegations in Defendant's Motion are not sufficient to overcome her earlier assertions, made under oath and corroborated by both her trial counsel and the prosecutor, that there were no plea agreement offers in this case. *See Lafler*, 132 S.Ct. at 1385 ("[i]f no plea offer is made …

[ineffective assistance of counsel] simply does not arise.").

*B. Whether Defendant Was Willing to Accept A Plea Offer*

Further, the Court holds alternatively that to the extent that the July 2012 email is considered to be a plea agreement offer of 30 to 37 months, Defendant's allegations are not sufficient to demonstrate a reasonable probability that she would have accepted such a plea offer at any time prior to trial as her uncorroborated allegations cannot overcome the ample evidence of her repeated assertions of innocence and denials of culpability made throughout the proceedings before this Court – a position which she ceded only partially at her sentencing hearing.

To demonstrate prejudice, Defendant must show that "'the outcome of the plea process would have been different with competent advice.'" *Shotts*, 724 F.3d at 376 (quoting *Lafler*, 132 S. Ct. at 1384)), which requires a showing of a reasonable probability that she would have accepted the plea offer. Courts routinely examine the record to determine the credibility of post-sentencing assertions by prisoners indicating a willingness to bargain. *See e.g., Shotts*, 724 F.3d at 376; *United States v. Seeley*, 574 F. App'x 75 (3d Cir. 2014) ("Ulrich testified that, throughout her dealings with her client, Seeley never gave her any indication that she was interested in cooperating with the government or pleading guilty. Seeley maintained a steadfast insistence that she was innocent."); *United States v. Gonzalez-Rivera*, 217 F. App'x 166, 170 (3d Cir. 2007) ("Gonzalez-Rivera argues summarily that he would have accepted a plea agreement and that there is a reasonable probability that his sentence would have been more favorable had he pursued a plea agreement. The alleged prejudice that he may have suffered as a result is far too speculative. Gonzalez-Rivera's contention that he would have accepted a guilty plea is belied by the evidence below."). In instances where a defendant maintains innocence at trial and testifies

in his or her own defense consistent with such innocence, the Court must reconcile the apparent inconsistencies between the proffered allegations and the earlier statements. *See e.g., Barndt*, 2014 WL 4187983 (McVerry, J.) ("the Court would still conclude that he has not plausibly alleged that he would have pled guilty pursuant to the offer's terms—his self-serving affidavit to that effect notwithstanding. Barndt consistently maintained throughout trial, at sentencing, and on appeal that there was insufficient evidence to link him to the alleged cocaine trafficking conspiracy."); *Matthews v. United States*, No. CIV. 10-1740, 2013 WL 1674948, at *12 (W.D. Pa. Apr. 17, 2013) (Conti, C.J.) ("defendant failed to make a showing that there is a reasonable probability that but-for Bailor's ineffective assistance, he would have pleaded guilty to the charges against him in the superseding indictment. The court does not find petitioner's testimony that but-for Bailor's errors he would have pleaded guilty credible in light of his testimony and filings throughout the proceedings before this court, which evidence his intent not to plead guilty to the charges against him."). As one court has persuasively noted,

> a defendant who has actually testified to a jury that [s]he is innocent faces a formidable barrier to convince the court that [s]he really wanted to plead guilty. … And, this is certainly not like the usual § 2255 argument made by a defendant who went to trial, put the government to its burden of proof and exercised [her] right to remain silent at trial. A defendant who has not told a jury [s]he is innocent has at least a chance of making a credible argument that [s]he wanted to plead guilty.

*Williams v. United States*, Civ. No. 4:12-cv-252, 2013 WL 6410015, at *4 (E.D. Mo. Dec. 9, 2013). It is also axiomatic that "'[l]awyers must take clients as they find them, and the client who persists in [her] protestation of innocence would scarcely welcome advice from [her] champion that would assure [her] incarceration.'" *United States v. Livingston*, No. 1:09-CR-0072-03, 2014 WL 5801612, at *8 (M.D. Pa. Nov. 7, 2014) (quoting *United States v. Gordon*, 979 F. Supp. 337, 341 (E.D. Pa. 1997)).

At her trial, Defendant testified that she told her attorney the day she met him that she was unaware of the fraud. (Docket No. 190 at 73). Although the Court did not find many of Defendant's underlying assertions about her awareness of the fraud to be credible, as outlined in detail above, the Court believes this statement about what she told her trial counsel to have been accurate. *See United States v. Maxshure*, 579 F. App'x 136, 140 (3d Cir. 2014) (citing *United States v. Brothers*, 75 F.3d 845, 853 (3d Cir. 1996) (Court of Appeals "give[s] great deference to the sentencing court's assessments of witnesses' credibility."). It was corroborated by all of the activities that her trial counsel took on her behalf throughout this case, including: entering a not guilty plea; filing pretrial motions; taking the case to trial; and his arguments on Defendant's behalf to the jury. Defendant has also made no effort to repudiate this sworn testimony, which the Court credits. (*See* Docket Nos. 239, 244).

Defendant's false testimony about her fraudulent activities notwithstanding, her assertions of innocence and inability to comprehend her guilt prior to trial were also corroborated by her therapist, Ms. Strassner, in both her letter and testimony at the sentencing hearing. (Docket No. 213-1; *Sent Trans. 12/4/13*). Like her relationship with trial counsel, Defendant's relationship with her therapist started around the time of her indictment and continued through her sentencing. (Docket No. 227 at 4). Ms. Strassner testified that Defendant "had no comprehension as to what she did wrong when we started out. And that was a genuine, sincere thing." *Sent Trans. 12/4/13*. She related in her letter that Defendant "spent many sessions trying to comprehend how others could not see she was innocent of the crime." (Docket No. 213-1 at 3). Ms. Strassner further stated that Defendant's "denial of any wrong doing [...] remained consistent and never wavered." (*Id.*). Ms. Strassner even told the Court that other employees involved in the case had tried to persuade Defendant to plead guilty "but she stated could not lie

and say she had committed a crime when she had not. She could not understand how, when she had no interactions with those actually involved with the fraud, […] she could be found guilty." (*Id.*).  All of this information was provided by Defendant to the Court at sentencing, the Court found Ms. Strassner's Report and testimony to be credible, (*see* Docket No. 227 at 4), and Defendant has not disavowed such evidence in any way.

Moreover, Defendant took her assertions of innocence to the extreme length of lying under oath at trial about many material matters in the case, as outlined above.  *See Quintana*, 2012 WL 3151260, at *1 ("[Defendant] told his lawyer that he committed no crime—going so far as committing perjury during the state trial in maintaining his innocence—and even sufficient advice would not have changed [Defendant]'s mind.").  She even testified that the witnesses against her were liars.  (Docket No. 191 at 66-68). The Court's many observations of Defendant's behavior during her trial testimony likewise support the fact that she had told anyone who would listen that she was not guilty of the offenses charged.  *See Sent. Trans. 1/7/14*. Again, she glared at government witnesses with disdain in a manner that continues to trouble the Court.  She evaded questioning like no other witness the Court has observed.  *Id.*  At the same time, she exhibited traits of being controlling and domineering which behavior was consistent with her former employees' descriptions of her workplace demeanor.  *Id.*  She was the boss and in charge at trial just like she was during her time at 1st Olympic running an office of mostly younger women and an uninterested business owner in Mr. DiSilivio.  *Id.*

Additionally, the evidence of record shows that Ms. Strassner believed that Defendant was "dumbfounded" by the jury's verdict which was rendered in April of 2013.  *Sent. Trans. 12/4/13* at 17-18. Ms. Strassner testified that eight months later Defendant was still working with her attorneys, (i.e., her sentencing team), in order for her to more fully understand her guilt.  *Id.*

Even during her allocution, Defendant hedged considerably, telling the Court that she was now able to accept the wrongfulness of her criminal conduct but that it was still "very difficult" for her to accept. She added that "I appreciate now after everything being put to light in a different way, in my mind, that there's no excuse for my actions." *Sent. Trans. 12/4/13*. The apprehension in her words mirrored her demeanor at the time of this statement. The fact that Defendant remained somewhat noncommittal at that juncture of the case, after having been convicted at trial and adjudicated a perjurer by the Court in a decision that she told the Court she had read and understood, totally undermines her position that she would have acknowledged her guilt and pled guilty before the trial. *See United States v. Segura*, 209 F. App'x 128, 136 (3d Cir. 2006) ("Finally, even if there were evidence that the Government offered Segura a plea bargain (which there is not), there is insufficient evidence that Segura would have taken the deal. To the contrary, Segura remains noncommittal even now regarding whether he would actually have accepted a plea. […] This equivocal, after-the-fact speculation is too slender a reed to sustain Segura's claim of prejudice.").

Based on the collective strength and weight of this evidence, there is not a reasonable probability that Defendant would have pled guilty had she received advice from her trial counsel that she should have accepted the July 2012 plea agreement proposal and pled guilty prior to trial. *See Lafler*, 132 S.Ct. at 1385 (it is defendant's burden to show that "there is a reasonable probability that the plea offer would have been presented to the court […] i.e., that the defendant would have accepted the plea"). To be clear, given the overwhelming evidence against her position, the Court sincerely doubts Defendant's uncorroborated assertions that her trial counsel did not advise her to plead guilty and try to negotiate the best possible outcome on her behalf. *Samet v. United States*, 559 F. App'x 47, 49 (2d Cir. 2014) ("district courts need not accept the

uncorroborated statements of a criminal defendant at face value.") (citing *Purdy v. Zeldes*, 337 F.3d 253, 259 (2d Cir. 2003) ("[I]n most circumstances a convicted felon's self-serving testimony is not likely to be credible.")). The record shows that others tried to get Defendant to plead and it remains highly unlikely that her trial counsel did not. (Docket No. 213-1). But, even if trial counsel did not provide her such specific advice, she has not even alleged that she would have accepted the plea agreement that the prosecutor generally outlined in the July 2012 email. (*See* Docket Nos. 239, 244). Instead, Defendant points only to her off the record statements to her counsel at the pretrial conference that she would have pled guilty in exchange for a sentence of probation, which she believes demonstrates some willingness on her behalf to plead. (*Id.*). The Government, however, had no interest in making an offer to Defendant which excluded jail time and rejected this advance. "Put more colloquially, to consummate a plea bargain, it takes two to tango, and there is no reason to believe that the Government wanted to dance." *Segura*, 209 F. App'x at 136. In short, whatever minimal plea negotiations there were left the parties at an impasse; making this a "must-try" case.

Defendant makes much of her trial counsel's alleged lack of preparation and diligence in reviewing the evidence against her and his purported inability to fully explain to her how a jury would evaluate the evidence against her in light of the relevant legal standards applicable to the charges. (Docket Nos. 239, 244). She then continues that if the potential arguments she later presented for downward departures and variances were more fully explained to her, she would have understood that she had a likely chance of a lesser sentence and decided to plead. (*Id.*). However, convincing Catherine Slane that she was guilty was not a one-man job. Instead, what she fails to appreciate is the extraordinary efforts and great lengths that were taken by others before she was able to grasp the wrongfulness of her conduct and admit her guilt. Again, the

Government presented 28 witnesses and hundreds of exhibits against her, outlining in excruciating detail the role she played in the fraud. (*See* Docket Nos. 135, 136). Her former employees testified that she was aware of the fraud and participated. (*See* Docket Nos. 191 at 66; 188 at 68). Ms. Grindle even explained how Defendant trained her to close these transactions. (Docket No. 180 at 17-18, 23-24, 68). Rather, Defendant remained unconvinced, willingly took the witness stand and lied repeatedly in an effort to avoid the consequences of her actions. (Docket Nos. 190, 191). She remained resolute in her assertions of innocence throughout trial. (*See* Docket No. 190 at 45-46 ("never in my life did I know that there was any fraud going on.")). Even after the convictions, it took the addition of three more attorneys to her sentencing team, months of meetings with them, continued therapy with Ms. Strassner and the Court's formal finding that she committed perjury for her to finally accept some responsibility for her crimes. There is nothing in her Motion or Reply which – if proven at a hearing – convinces the Court otherwise. (*See* Docket Nos. 239, 244).

Certainly, with the benefit of hindsight and after spending time incarcerated away from her family, Defendant sees the many errors of her ways. But, she cannot meet the legal standard to demonstrate that she was prejudiced by the actions or inactions of her trial counsel during the plea discussions. Her position is not credible given all of the contrary evidence the Court has outlined. As the Government points out, reviewing the July 2012 email from her trial counsel makes clear that Defendant proceeded to trial understanding that she faced a potential increase in her sentence of around 30 months if she was found guilty at trial. (Docket No. 239-1). It is somewhat ironic that Defendant now claims that the Government should offer her a plea agreement – which it never did – with an advisory guidelines range of 30 to 37 months after having been sentenced to 60 months' incarceration or 30 more months than the low end of her

preferred range. Hence, setting aside the nuances of the guidelines calculations and the sentencing litigation which ensued, the pretrial estimate of Defendant's potential sentence now appears to have been largely accurate, at least as far as such pretrial estimates go.

The Court further points out that aside from the short discussion at the pretrial conference, Defendant has not even alleged that she *ever* authorized her trial counsel to engage in further plea negotiations on her behalf yet she suggests that he erred by not doing so on his own. (Docket Nos. 239, 244). Faced with a client who proclaimed her innocence, trial counsel simply "had no option but to proceed to trial because the initiation of plea discussions not authorized by a client maintaining [her] innocence would have been fruitless." *Gonzalez-Rivera*, 217 F. App'x at 169. Again, lawyers, particularly court-appointed lawyers, "must take clients as they find them," and the record does not demonstrate that Defendant would have welcomed advice from her trial counsel that would likely have assured her a period of incarceration. *Livingston*, 2014 WL 5801612, at *8 (internal quotation omitted). There is simply not a reasonable probability that Defendant would have accepted the alleged plea offer and pled guilty. *See Lafler*, 132 S.Ct. at 1385. Accordingly, she has failed to meet her burden to establish prejudice.

### C. Other Considerations

In light of these conclusions, the Court need not address the remaining factors, i.e., whether the prosecutor would have withdrawn the offer and if the Court would have accepted the agreement and sentenced Defendant to a term of incarceration less severe than her current sentence. *See Lafler*, 132 S.Ct. at 1385. In the absence of a plea offer, or any credible evidence that Defendant was willing to plead guilty prior to her trial, there is nothing for the Government to withdraw and nothing for the Court to accept. *Id.* There is likewise no evidentiary support for

the suggested remedy that the Government be required to re-offer a plea agreement to Defendant when, in fact, no plea agreement was ever drafted by the prosecutor in this case, rendering such remedy to be highly speculative. *Gonzalez-Rivera*, 217 F. App'x at 170 (3d Cir. 2007) ("The alleged prejudice that he may have suffered as a result is far too speculative."). To reiterate, criminal defendants have no right, constitutional or otherwise, for the Government to make them a plea offer. *Lafler*, 132 S.Ct. at 1385. Although this Court does not consider the email to be a plea agreement, it may have, at most, analyzed the communication as evidence to resolve disputes between the parties at a hypothetical sentencing hearing after Defendant pled guilty to one or all of the charges in order to arrive at the appropriate advisory guidelines range. All told, these issues are much too speculative for the Court to resolve in Defendant's favor. *See Gonzalez-Rivera*, 217 F. App'x at 170.

The final issue for the Court to address concerns the nature of any remedy to be afforded to Defendant. Even if she had met her burden of proof to show both ineffective assistance and prejudice, which she has not, the Court retains discretion to determine the appropriate remedy for such constitutional violation. *Lafler*, 132 S. Ct. at 1388-89. The Supreme Court has provided the following guidance on how to exercise this discretion.

> Sixth Amendment remedies should be "tailored to the injury suffered from the constitutional violation and should not unnecessarily infringe on competing interests." *United States v. Morrison*, 449 U.S. 361, 364, 101 S.Ct. 665, 66 L.Ed.2d 564 (1981). Thus, a remedy must "neutralize the taint" of a constitutional violation, *id.*, at 365, 101 S.Ct. 665, while at the same time not grant a windfall to the defendant or needlessly squander the considerable resources the State properly invested in the criminal prosecution. *See Mechanik*, 475 U.S., at 72, 106 S.Ct. 938
>
> …

> In implementing a remedy […], the trial court must weigh various factors; and the boundaries of proper discretion need not be defined here. Principles elaborated over time in decisions of state and federal courts, and in statutes and rules, will serve to give more complete guidance as to the factors that should bear upon the exercise of the judge's discretion. At this point, however, it suffices to note two considerations that are of relevance.
>
> First, a court may take account of a defendant's earlier expressed willingness, or unwillingness, to accept responsibility for his or her actions. Second, it is not necessary here to decide as a constitutional rule that a judge is required to prescind (that is to say disregard) any information concerning the crime that was discovered after the plea offer was made. The time continuum makes it difficult to restore the defendant and the prosecution to the precise positions they occupied prior to the rejection of the plea offer, but that baseline can be consulted in finding a remedy that does not require the prosecution to incur the expense of conducting a new trial.

*Id*.

In *Lafler*, the Court determined that the appropriate remedy given the facts was for the original plea offer to be re-extended to the defendant. Hence, it remanded the case with the expectation that the trial court would convene further proceedings to determine how best to exercise its discretion in light of these principles. But, such result does not compel a similar decision in the instant matter as the facts of *Lafler* are distinguishable. To this end, Cooper was extended a plea agreement offer by the prosecution to plead to certain charges in exchange for a sentence of 51 to 85 months and he informed the Court around the time of the offer that he was willing to accept the plea deal. *Id*. at 1383. Cooper later rejected the plea offer based on incorrect advice from his counsel that he should turn down the offer because the prosecution would be unable to sustain its burden of proof at trial to show that he acted with intent to murder. *Id*. Further, Cooper did not testify at his trial and assert his innocence. *Id*. Rather, the facts of the case were such that he obviously fired a weapon at the victim but his counsel believed that

intent to murder could not be proven because he had only hit the victim below the waist. *Id.*
Cooper was convicted of all counts including discharging the firearm with intent to murder and
sentenced to a mandatory minimum penalty of 185 to 360 months. *Id.*

As the Court has already explained in great detail above, this case is far removed from
*Lafler*. There was no plea offer extended to Defendant and no evidence that her trial counsel told
her to reject the proposal in the July 2012 email or that she was even willing to engage in plea
bargaining of the type described by the prosecutor at any time. The alleged erroneous advice
here did not lead to the imposition of a mandatory minimum sentence of incarceration which was
a decade longer than the initial offer. And most importantly, this Defendant denied culpability
and lied about her role in the fraud to the jury.

Given these circumstances, any remedy requiring the Government to make a plea offer to
Defendant of 30 to 37 months (or 33 to 41 months as the Government suggests) including
reductions for acceptance of responsibility and timely notification of her intention to plead as
well as not applying the enhancement for obstruction of justice, would represent an unearned
windfall to Defendant and in effect compensate her for engaging in poor, indeed criminal
behavior during her testimony. *See Lafler*, 132 S. Ct. at 1388-89. Such a result would be unfair
to the Government which expended considerable prosecutorial resources trying this case and
litigating sentencing disputes as well as the Court which also spent significant time and effort
presiding over this matter. Likewise, the public has an interest in the adjudication of fair and
speedy trials of the accused in criminal cases such as the one that occurred here. *See* 18 U.S.C. §
3161; *see also* FED. R. CRIM. P. 2. Additionally, it would be fundamentally unfair to all
defendants who exercise their Constitutional rights to put the Government to its burden of proof
at trial and their rights to remain silent in the face of criminal charges. *See Williams*, 2013 WL

6410015, at *4. While Defendant retained the absolute right to testify in her defense, **no one** has the right to take the sworn oath to tell the truth and then testify falsely in the manner that she did at trial. *See United States v. Dunnigan*, 507 U.S. 87, 1117 (1993) ("a defendant's right to testify does not include a right to commit perjury.").

Accordingly, as described in *Lafler*, at any hypothetical resentencing hearing, the Court would consider all of Defendant's behavior including her unwillingness to plead guilty, repeated denials of culpability and numerous instances where she testified falsely. Even if the Government made the plea offer now, it is not a Rule 11(c)(1)(C) plea agreement that would be binding on the Court, which also has broad discretion to consider Defendant's background and behavior at sentencing. *See* 18 U.S.C. § 3661. Hence, at least an additional five offense levels would be added to Defendant's preferred offense level, arriving at an advisory guidelines range of 51 to 63 months (or 57 to 71 months as the Government argues). Notably, the sentence of sixty (60) months incarceration is within either of these proffered ranges. Defendant's sentence was also arrived at by the Court after careful consideration of all of the section 3553(a) factors in this case and remains appropriate, even after considering the limited evidence concerning the parties' plea negotiations (or lack thereof) which occurred here. The Court stated on the record at Defendant's sentencing that the introduction of pro bono counsel and the extensive sentencing litigation that ensued did not affect the ultimate sentence which was imposed in the case and the same principles would apply here to deny any relief to this Defendant from her sentence which was arrived at with full consideration of her behavior, the evidence submitted at sentencing, along with her allocution and counsel's arguments in light of the pertinent policy statements, case authority and the § 3553(a) factors. *See Sent. Trans. 1/7/14* (addressing pro bono counsel and stating "I don't believe that your injection into the case would have caused this result to be

unlike what it is. So, I think that you've handled the case ably but the facts are what the facts are.").

To the extent that Defendant continues to advocate that her sentence is unfair in relation to the sentences imposed on her codefendants, Shaheen and Kamaras, as the Court stated at sentencing, Defendant is not similarly situated to those individuals as they both pled guilty, accepted responsibility for their crimes and did not commit perjury at trial. *See United States v. Parker*, 462 F.3d 273, 276 (3d Cir. 2006) (quotations omitted) ("a criminal defendant has no constitutional right to be given a sentence equal in duration to that of his or her co-defendants."). Additionally, the Court conducted an individualized assessment of the section 3553(a) factors in each of their respective cases. Shaheen was sentenced to probation but he was gravely ill such that he was sentenced in absentia and passed away shortly thereafter. (Docket Nos. 169-171). Kamaras pled guilty to one substantive count of wire fraud, had an advisory guidelines range of 33 to 41 months at sentencing and was granted a variance after a full consideration of the § 3553(a) factors in his case, resulting in a sentence of 18 months' incarceration. (Docket Nos. 160-161).

### D. Conclusion

For all of these reasons, the Court finds that Defendant has failed to establish that she was prejudiced by the alleged ineffective assistance of her trial counsel and her Motion must be denied.

## V.     CERTIFICATE OF APPEALABILITY

In addition, the Court further holds that Defendant has not demonstrated a "substantial showing of the denial of a constitutional right" as required under 28 U.S.C. § 2253(c)(2), and

therefore orders that she is not entitled to a certificate of appealability on any of the claims asserted in her Motion.

VI.     CONCLUSION

Based on the foregoing, Defendant's Motion [239] is DENIED. An appropriate Order follows.

                                          *s/Nora Barry Fischer*
                                          Nora Barry Fischer
                                          United States District Judge

Date:   February 19, 2015

cc/ecf: All counsel of record.